ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:14 C R  353 |
| v. | ) | |
| | ) | Title 18, United States Code, |
| CHRISTOPHER L. GATTARELLO, | ) | Sections 2, 1349, 1957(a), |
| ROBERT A. SHAW, SR., and | ) | and Title 42, United States Code, |
| WILLIAM S. JACKSON, JR. | ) | 7413(c)(1) |
| | ) | |
| Defendants. | ) | |

JUDGE NUGENT

MAG. WHITE

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material and relevant to this Indictment:

### The Defendants

1.  Defendant CHRISTOPHER L. GATTARELLO ("GATTARELLO") has owned and controlled several municipal garbage hauling businesses in the greater Cleveland, Ohio area. Two of GATTARELLO's most recent businesses were Reach Out Disposal, LLC ("Reach Out") and Axelrod Rubbish Recycling International Global, LLC ("Axelrod").

1

2. Defendant ROBERT A. SHAW ("SHAW") worked for GATTARELLO at Reach Out and Axelrod. SHAW, who represented himself to be the Chief Financial Officer of Reach Out and Axelrod, was responsible for some of the financial aspects of Reach Out and Axelrod.

3. Defendant WILLIAM S. JACKSON, JR. ("JACKSON") owned and operated a building demolition company located in Cleveland, Ohio.

### AIM Business Capital, LLC ("AIM")

4. AIM Business Capital, LLC ("AIM") was a financial company that specialized in factoring. AIM factored by purchasing accounts receivable ("receivables") from businesses. Receivables were invoices billed to customers for goods sold or services provided. Businesses that factored their receivables with AIM obtained immediate cash for operations. AIM, like other factoring companies, purchased the receivables at a percentage discount of the invoice. AIM made a profit by collecting the full amount of the invoice from the business's customers.

5. Between on or about October 11, 2011, and April 2, 2012, SHAW, on behalf of Reach Out and Axelrod, entered into contracts with AIM for the purchase of receivables from Reach Out and Axelrod.

The Grand Jury further charges:

### COUNT 1
(Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1343,
in violation of 18 U.S.C. § 1349)

6. The factual allegations in paragraphs 1 through 5 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

7. Company 1 was a business located in Cleveland, Ohio. Company 1 had a contract with Reach Out for the disposal of garbage generated by Company 1. Company 1 was owned and operated by "Owner 1."

8.  From on or about October 19, 2011, through on or about November 28, 2012, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants CHRISTOPHER L. GATTARELLO, ROBERT A. SHAW, and Owner 1, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree together and with each other to commit an offense against the United States of America, that is, to devise and intend to devise a scheme and artifice to defraud AIM and to obtain money and property from it by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme and artifice to defraud causing to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## Object Of The Conspiracy

9.  The object of the conspiracy was to enrich defendants GATTARELLO and SHAW by defrauding AIM Business Capital, LLC ("AIM") through the sale of false and fraudulent receivables and attempting to conceal the fraud from AIM.

## Manner And Means

It was part of the conspiracy that:

10.  GATTARELLO and SHAW induced AIM to purchase receivables from Reach Out or Axelrod.

11.  GATTARELLO directed that false and fraudulent Reach Out and Axelrod invoices be created. He further directed that these false and fraudulent invoices be submitted to AIM.

12.  GATTARELLO, SHAW, and other co-conspirators, made false statements to AIM to conceal the nature of the false and fraudulent receivables sold to AIM.

## Company 1

13. In or around October 2011, SHAW proposed to AIM that it purchase Reach Out receivables associated with garbage hauling services that Reach Out was purportedly providing to Company 1. AIM agreed to buy them. On or about April 2, 2012, SHAW proposed to AIM that it purchase Axelrod receivables associated with garbage hauling services that Axelrod provided to Company 1. AIM agreed to buy them.

14. Beginning on or about October 19, 2011, and continuing through on or about August 3, 2012, GATTARELLO directed a Reach Out employee to create false and fraudulent Reach Out and Axelrod invoices related to Company 1. These invoices indicated that Reach Out or Axelrod was owed money from Company 1 for services that Reach Out or Axelrod had purportedly provided to Company 1. In fact, as GATTARELLO then well knew, no such services had been provided to Company 1.

15. GATTARELLO directed a Reach Out employee to transmit, by fax and email, the false and fraudulent Reach Out or Axelrod invoices to AIM.

16. In or around mid-April 2012, GATTARELLO and Owner 1 hosted a meeting with an AIM employee in Cleveland. GATTARELLO and Owner 1 falsely stated to the AIM employee that the Reach Out and Axelrod invoices from Company 1 were legitimate.

17. GATTARELLO and Owner 1, together with others, caused a loss to AIM of approximately $157,627.

## County Job

18. In or around March 2012, GATTARELLO proposed that AIM purchase receivables from Reach Out and Axelrod associated with garbage hauling services that Reach Out

4

and Axelrod were purportedly providing to Company 2 in Cuyahoga County. AIM agreed to buy them.

19.     Beginning on or about March 9, 2012, and continuing through on or about July 12, 2012, GATTARELLO directed a Reach Out employee to create false and fraudulent Reach Out and Axelrod invoices related to Company 2. These invoices indicated that Reach Out or Axelrod was owed money from Company 2 for services that Reach or Axelrod had provided to Company 2. In fact, as GATTARELLO then well knew, no such services had been provided to Company 2.

20.     GATTARELLO directed a Reach Out employee to transmit, by fax and email, the false and fraudulent Reach Out or Axelrod invoices to AIM.

21.     On or about May 1, 2012, GATTARELLO and SHAW convinced AIM to send statements requesting payment of the Reach Out and Axelrod receivables to Reach Out, instead of to Company 2. GATTARELLO and SHAW explained to AIM that payment for these invoices would be from Reach Out and not from Company 2.

22.     On or about July 19, 2012, in response to questions from AIM about the validity of invoices associated with the County Job, SHAW forwarded, by email, a letter purporting to be from a Company 2 employee attesting to the validity of the County Job invoices. As GATTARELLO and SHAW then well knew, the letter was false and fraudulent in that it was created by a Reach Out employee.

23.     On or about August 1, 2012, GATTARELLO directed a Reach Out employee to purchase telephone service with a number containing the area code of Company 2's headquarters. GATTARELLO directed the Reach Out employee to falsely represent himself as a Company 2 employee when answering the telephone.

24. On or about August 3, 2012, GATTARELLO and SHAW caused the last payment to be sent, by wire transfer from Reach Out's bank account, to AIM for invoices purportedly associated with the County Job. At this time, AIM had not been paid for all of the invoices related to the County Job.

25. On or about August 22, 2012, SHAW provided the telephone number described above to AIM.

26. On or about August 23, 2012, an AIM employee called the telephone number SHAW had provided. Upon answering the telephone, and as directed by GATTARELLO, the Reach Out employee represented himself as a Company 2 employee and falsely stated that the invoices for the County Job were valid.

27. GATTARELLO and SHAW, together with others, caused a loss to AIM of approximately $703,231.

## Company 3

28. In or around September 2012, SHAW proposed that AIM purchase Reach Out and Axelrod receivables associated with garbage hauling services that they were purportedly performing for Company 3. AIM agreed to buy them.

29. Beginning on or about September 14, 2012, and continuing through on or about November 28, 2012, GATTARELLO directed a Reach Out employee to create false and fraudulent Reach Out and Axelrod invoices related to Company 3. These invoices indicated that Reach Out or Axelrod was owed money from Company 3 for services that Reach Out or Axelrod had provided to Company 3. In fact, as GATTARELLO then well knew, no such services had been provided to Company 3.

30. GATTARELLO directed a Reach Out employee to transmit, by fax and email, the false and fraudulent Reach Out or Axelrod invoices to AIM.

31. GATTARELLO and SHAW, together with others, caused a loss to AIM of approximately $321,475.

## Acts in Furtherance of the Conspiracy

32. On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, the defendants, GATTARELLO and SHAW, for the purpose of executing the scheme and artifice, transmitted and caused to be transmitted, by means of wire communications in interstate commerce, writings, signs, signals, pictures and sounds; as set forth below:

*Emails*

33. On or about the dates listed below, SHAW sent the following emails from Cleveland, Ohio, to AIM in Lafayette, Louisiana:

| Approximate Date | Description | Sender | Recipient(s) |
|---|---|---|---|
| July 19, 2012 | Letter from Company 2 to GATTARELLO about the validity of the invoices associated with the County Job | SHAW | Two AIM employees |
| July 19, 2012 | Email from SHAW submitting a list of Reach Out invoices associated with the County Job | SHAW | Two AIM employees |
| August 22, 2012 | Email from SHAW providing the phone number of a Company 2 employee who could verify the legitimacy of the County Job invoices | SHAW | One AIM employee |

7

*Wire Transfers*

34. On or about the dates listed below, GATTARELLO and SHAW transmitted and caused to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures and sounds; specifically the wire transfers in the approximate amounts described below:

| Approximate Date | Amount | Wire Origination Source and Location | Wire Destination Recipient and Location |
|---|---|---|---|
| May 16, 2012 | $57,355.00 | AIM Lafayette, Louisiana | Citizen's Bank Axelrod Bank Acct. Warrensville, Ohio |
| March 21, 2012 | $49,799.00 | AIM Lafayette, Louisiana | Citizen's Bank Reach Out Bank Acct. Warrensville, Ohio |
| November 26, 2012 | $39,900.87 | AIM Lafayette, Louisiana | Citizen's Bank Reach Out Bank Acct. Warrensville, Ohio |

35. As a result of the foregoing conspiracy and fraudulent conduct, AIM was defrauded and sustained a loss of approximately $1,182,333.

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

## COUNT 2
(Engaging in a Monetary Transaction in Property Derived from a Specified Unlawful Activity, in violation of 18 U.S.C. §§ 1957 and 2)

36. The factual allegations in paragraphs 1 through 5, 7, and 10 through 35 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

37. On or about the following date, in the Northern District of Ohio, Eastern Division, and elsewhere, CHRISTOPHER L. GATTARELLO did knowingly engage and attempt to engage in a monetary transaction, described below, by, through, and to a financial institution, affecting

interstate and foreign commerce, in criminally derived property of a value greater than $10,000, which was derived from specified unlawful activity; that is, wire fraud. Specifically, GATTARELLO caused the following payment and transfer:

| COUNT | Approximate Date | Amount Involved in Transaction | Description of Transaction |
|---|---|---|---|
| 2 | June 25, 2012 | $12,084.27 | Payment of GATTARELLO's personal American Express credit card from Reach Out's account, which included a $1,013.63 charge at Toys 'R' Us and a $935.12 charge at Dick's Sporting Goods |

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 3
### (Clean Air Act – Failure to Remove Asbestos Prior to Demolition, 42 U.S.C. § 7413(c)(1))

At all times material and relevant to this Indictment:

38. The factual allegations of paragraphs 1 through 3 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

### Summary of Asbestos Regulations

39. In 1971, asbestos, a widely-used insulation and building material, was declared a hazardous air pollutant by the United States Environmental Protection Agency ("U.S. EPA") under the Clean Air Act, 42 U.S.C. § 7412.

At all times material herein:

40. The U.S. EPA has promulgated regulations concerning the renovation and demolition of buildings which contain asbestos. See 40 CFR §§ 61.145 and 61.150 et seq., ("the asbestos regulations") or the National Emission Standards for Hazardous Air Pollutants

("NESHAP"). Demolition was defined as the removal of load-supporting beams. See 40 CFR § 61.140. The asbestos regulations applied to demolition activities if the amount of friable asbestos in the building to be demolished was at least 260 linear feet, 160 square feet, or 35 cubic feet. See 40 CFR § 61.145(a)(1).

41. The U.S. EPA delegated to the State of Ohio, and the State of Ohio delegated to CDAQ, the authority to enforce the asbestos NESHAP program in the City of Cleveland.

42. The owner or operator of a demolition activity was required to ensure that all friable asbestos was removed from a facility before demolition began. Specifically, all friable asbestos was required to be removed before any activity began that would break up, dislodge, or similarly disturb the material. See 40 CFR § 61.145(c)(1). The owner or operator of a renovation or demolition activity was defined as any person who owned, leased, operated, controlled, or supervised the facility being demolished, or any person who owned, leased, operated, controlled, or supervised the demolition activity, or both. See 40 CFR § 61.141.

43. In addition, the owner or operator was required to ensure that all asbestos-containing waste materials were deposited, as soon as practical, at a licensed asbestos waste disposal facility. See 40 CFR § 61.150(b). Asbestos-containing waste was friable asbestos or any material contaminated by asbestos. See 40 CFR § 61.141.

<u>The Former National Acme Facility</u>

44. The former National ACME facility (the "Facility") is located at 170 East 131st Street, Cleveland, Ohio. Constructed in 1917 by the National ACME Company, the 570,000 square foot facility was used for manufacturing purposes for nearly a century. Many residences are located within a half mile of the Facility, as is the Iowa Maple Elementary School.

45. On or about June 24, 2011, GATTARELLO, on behalf of All Points Rubbish Disposal, LLC, entered into an agreement to lease the Facility. GATTARELLO represented to the lessor that paper and cardboard waste products would be recycled at the Facility.

46. On or about July 1, 2011, a certified asbestos abatement company prepared an estimate for the removal of the asbestos in the Facility. The estimate for the entire Facility was $1,500,000. For the warehouse portion of the Facility alone, the estimate was $1,000,000 and provided for the removal of 24,000 linear feet of asbestos containing pipe insulation.

47. GATTARELLO did not hire anyone to abate the asbestos from the Facility.

48. Beginning on or around August 2011, GATTARELLO directed that paper and cardboard waste products, as well as municipal garbage ("solid waste") be delivered to the Facility for recycling. During the next several months, GATTARELLO directed that more paper, cardboard, and solid waste be delivered to the Facility than could be recycled. The paper, cardboard, and solid waste began to accumulate outside the Facility. GATTARELLO then directed that the accumulating waste be moved inside the Facility. By the end of April 2012, a majority of the Facility was filled with solid waste.

49. On or about May 24, 2012, GATTARELLO, on behalf of Reach Out, entered into a contract to purchase the Facility. During negotiations for purchase of the Facility, GATTARELLO discussed his intent to demolish the Facility and sell any metal removed from the Facility as scrap.

50. On or about July 1, 2012, JACKSON submitted a notice of demolition to the Cleveland Division of Air Quality ("CDAQ"). CDAQ was the local air pollution control agency that served the City of Cleveland. The notice stated that there was no asbestos in the Facility.

51. On or about July 11, 2012, the CDAQ sent JACKSON a letter concerning demolition of the Facility. The letter rejected the notice because it was incomplete, and further stated that demolition at the Facility "may not begin" until a proper notice was submitted and approved by CDAQ.

52. Neither JACKSON nor GATTARELLO sent another notice of demolition to the CDAQ.

53. Starting on or about July 21, 2012, at GATTARELLO's direction, JACKSON began demolishing the Facility in earnest. JACKSON used an excavator with a hydraulic "scissors" cutting attachment to cut the steel framing of the Facility, including load-bearing steel girders. In so doing, he released asbestos fibers into the environment because the Facility's pipes covered with friable pipe insulation containing more than one-percent asbestos JACKSON damaged, disturbed, and otherwise broke these insulated pipes covered with friable pipe insulation containing more than one-percent asbestos during the demolition.

54. As JACKSON continued to demolish the Facility at the direction of GATTARELLO, debris accumulated outside the Facility. The friable asbestos contained in these piles was exposed to the wind and elements.

55. Demolition of the Facility ended on or about August 30, 2012. When the demolition was halted, approximately forty percent of the warehouse portion of the Facility had been demolished.

56. From on or about August 1, 2012, and continuing through on about August 30, 2012, in the Northern District of Ohio, Eastern Division, Defendants CHRISTOPHER L. GATTARELLO and WILLIAM S. JACKSON, JR. were the owners and operators of a demolition activity involving a facility that contained more than 260 linear feet of friable asbestos, and

knowingly failed to comply with the requirement to remove asbestos before demolition activities began specified in 40 C.F.R. § 61.145(c)(1), that is, GATTARELLO and JACKSON did not remove the friable asbestos from the Facility before causing the removal of scrap metal from the Facility which resulted in the breaking up, dislodging, and disturbing of friable asbestos.

All in violation of 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2.

The Grand Jury further charges:

COUNT 4
(Clean Air Act - Failure To Dispose of Asbestos Waste, 42 U.S.C. § 7413(c))

57. The factual allegations of paragraphs 1 through 3 and 39 through 55 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

58. From on or about August 1, 2012, and continuing through on about August 30, 2012, in the Northern District of Ohio, Eastern Division, CHRISTOPHER L. GATTARELLO and WILLIAM S. JACKSON, JR. were the owners and operators of a demolition activity involving a facility that contained more than 260 linear feet of friable asbestos, and knowingly failed to comply with the asbestos waste disposal standards under 40 C.F.R. § 61.150, that is, GATTARELLO and JACKSON did not, as soon as practical, properly deposit the asbestos containing waste materials generated as a result of the demolition activities at the Facility at a licensed asbestos waste disposal facility.

All in violation of 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2.

A TRUE BILL.

Original document - - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002